417 A.2d 1178

**In the Interest of James Albert BLACK, a minor child.**

**Appeal of Patricia OHLER and George Albert Black, Appellants.**

Superior Court of Pennsylvania.

Argued April 10, 1979.

Filed Jan. 4, 1980.

538

540

Frederick W. Heintz, Jr., Uniontown, for appellants.

Lynn N. Crenney, Uniontown, for appellee.

Before PRICE, HESTER and MONTGOMERY, JJ.

PRICE, Judge:

This is an appeal by Patricia Ohler and George Albert Black, the parents of an infant, James Albert Black, from the hearing court's finding that this child is a "deprived child" within the meaning of the Juvenile Act,[1] and award of legal custody to the Fayette County Child Welfare Services (CWS). Because we find no merit in the issues raised on appeal, we affirm the order of the hearing court.

James Albert Black, born on April 28, 1978, was released directly into the care of CWS in accordance with a temporary order entered on May 2, 1978. A hearing was held on June 2, 1978, on petition from a social worker at CWS, to make the determination of deprivation. The following evidence was adduced at that hearing.

The natural mother, Patricia Ohler, was unmarried and twenty years of age at the time of the hearing. Her first child Ida Marie Ohler, was born June 5, 1975, and died on March 17, 1976, at the age of nine months, twelve days as a result of dehydration and toxemia. At the time of death, she was also suffering from malnutrition. Nurse Zeman, a registered nurse, testified at the hearing that the symptoms of dehydration are dry, cracked mucous membrane and lips, sunken eyeballs, poor turgor of the skin, white or clay colored stools, and reddish brown, concentrated urine with a foul smell. She also testified that it takes a baby one to two months to die from dehydration. The mother testified that she had not noticed any symptoms.

1. Act of December 6, 1972, P.L. 1464, No. 333, § 1 et seq., 11 Pa.C.S. § 50–101, et seq., amended by Act of August 3, 1977, P.L. 155, No. 41, § 1, repealed by Act of April 28, 1978, P.L. 202, No. 53, § 2(a) [1460], effective June 27, 1978, 42 P.S. § 20002 [1460], substantially reenacted, 42 Pa.C.S. § 6301 et seq.

The second child born to Ms. Ohler also died shortly after birth. That child, William Lee Black, was born to Ms. Ohler and George Albert Black on February 26, 1977, and died on April 5, 1978, at the age of one year and nine days. The immediate cause of death was tyogenic broncho pneumonia with bilateral respiratory insufficiency, which evidences itself with the following symptoms: a definite wheeze, cough, sniffles, sneezing, ashen grey to blue coloring, breathing through the mouth and poor appetite. On April 4, 1978, the parents had taken William Lee to the emergency room of the Connellsville State Hospital at around 6:00 p. m. The child was released, and the parents were given a prescription for an antibiotic. The prescription was never filled, although the parents could have filled it free of charge by using a medical card they possessed through the welfare agency. Other evidence indicated that the child spent the night in a car with his parents even though the weather was cold that night. On April 5, 1978, the child was dead on arrival at the Connellsville State Hospital. Although appellants had left William Lee with relatives on the morning of the day he died, testimony indicated that the symptoms would probably be noticeable for a period of hours before death. The mother said, however, that she had noticed none.

The dwelling in which appellants resided during most of William Lee's life was a large farm house located in Dunbar. Testimony revealed that the house was filthy, with garbage cluttering every room. Human waste was accumulated in buckets and jugs and also in the bathtub as a result of the lack of toilet facilities occasioned by the water company discontinuing service. During winter months, only two or three rooms of the house were habitable due to a lack of heat because the electric company had terminated the electricity. Heat was provided by burning automobile tires in a stove given to the occupants of the house by a neighbor. Photographs of both the interior and exterior of the house were admitted into evidence to verify the accuracy of the testimony of the witnesses.

Appellants apparently moved to a house in Dawson a few days prior to the death of William Lee.[2] A case worker for the Fayette County Board of Assistance testified to the condition of this house, describing it as "somewhat cluttered," "not exactly" clean, and "below average in comparison to other families." (N.T. Vol. 2 at 19–20). Photographs of this home were also admitted into evidence and corroborated the dirty and disorderly nature of the environment. Patricia Ohler and George Black continued to live in this abode at the time of the deprivation hearing on June 2, 1978.

The issues to be determined at a deprivation hearing have been lucidly stated. First, the court must determine by clear and convincing evidence that the child was "deprived" as that term is defined under the Juvenile Act, 11 Pa.C.S. § 50–102(4), *substantially reenacted* 42 Pa.C.S. § 6302.[3] *In the Interest of Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1976); *In the Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976).[4] If the child is found not to be deprived, custody is immediately yielded to the parents. *In the Interest of Clouse, supra.* However, if deprivation is found, a second inquiry must be made by the court to discover if it is "necessary" to separate the child from the parents. *In re Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976); *In the Interest of Clouse, supra.*

2. As noted by the hearing court, the exact date that the parents vacated the home in Dunbar and took up residence in Dawson is unclear from the testimony.

3. The reenactment of the Juvenile Act substitutes the term "Dependent child" for "Deprived child" but is defined using the same language as the original Act.

4. The writer of this opinion has by his dissenting opinions in *LaRue* and *In the Matter of DeSavage*, 241 Pa.Super. 174, 188, 360 A.2d 237, 244 (1976), expressed the view that the majority of this court has been too technical in applying this standard in evaluating the evidence and should not engage in word-play to substitute its judgment for that of the hearing court. Although the writer continues to believe that the majority's overly strict interpretation of the "clear and convincing" standard is unnecessary, even accepting that standard, the evidence of this case is sufficient to find deprivation.

The function of the trial judge and the standard of review to be employed by appellate courts in examining these cases has also been well defined. The hearing judge is to receive evidence from all interested parties and also from objective, disinterested witnesses. *In the Interest of Clouse, supra; In the Interest of LaRue, supra.* The child should be represented by separate counsel since his interest may be distinct from that of the parents. *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974). The inquiry of the hearing judge should be comprehensive and searching and should produce a decision supported by specific findings of fact and a full discussion of the evidence. *Tobias v. Tobias,* 248 Pa.Super. 168, 374 A.2d 1372 (1977); *In the Interest of Clouse, supra.*

▮▮▮ If the hearing judge does not comply with these dictates, we will respond accordingly by remanding the case, for in custody cases the scope of our review is of the broadest nature, and we will not be bound by a finding that is not supported by competent evidence. *In re Custody of Neal,* 260 Pa.Super. 151, 393 A.2d 1057 (1978); *Helman Appeals,* 230 Pa.Super. 484, 327 A.2d 163 (1974). If the hearing judge does comply, we must defer to his findings and accord them great weight because he has had the opportunity to see and hear the witnesses, *In re Custody of Neal, supra; Clair Appeal,* 219 Pa.Super. 436, 281 A.2d 726 (1971), and the question of credibility in juvenile cases, as in all other cases, is for the judge hearing the case to decide. *In re Sharpe,* 248 Pa.Super. 74, 374 A.2d 1323 (1977); *Commonwealth ex rel. Meta v. Cinello,* 218 Pa.Super. 371, 280 A.2d 420 (1971). The inability of the reviewing court to nullify the fact-finding of the hearing judge is the fundamental limitation of the broad scope of review of the appellate courts. *See Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977).

▮▮▮ The goal of the courts in passing on a deprivation petition must be to effectuate the purposes of the Juvenile Act, one of which is "[t]o preserve the unity of the family whenever possible and to provide for the care, protection,

and wholesome mental and physical development of children coming within the provisions of this act." 11 Pa.C.S. § 50–101(b)(1), *reenacted*, 42 Pa.C.S. § 6301(b)(1). This part of the Act makes explicit the interplay and tension between the state's attempt to accomplish its purpose of protecting juveniles by requiring parents to respect the duty they owe their children and yet, to maintain the integrity of the individual family unit. *See In the Interest of LaRue, supra*, 244 Pa.Super. at 225, 366 A.2d at 1275. For the courts to sanction a serious intrusion such as state interference with the parent-child relationship, a strict burden of proof must be sustained by those that would seek to take the child from its parents. That the evidence be "clear and convincing" is mandated by statute, 11 Pa.C.S. § 50–320(c), *substantially reenacted*, 42 Pa.C.S. § 6341(c), for,

" 'A child cannot me [*sic*, be] declared "[deprived]" merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich   .   .   . .' " *In the Matter of DeSavage*, 241 Pa.Super. 174, 185, 360 A.2d 237, 242 (1976) *quoting Rinker Appeal*, 180 Pa.Super. 143, 148, 117 A.2d 780, 783 (1955).

Although the evidence in the instant case is purely prognostic, since James Albert has never been in the care and custody of his parents, such evidence is sufficient to meet the strict burden of proof necessary to declare a newborn infant deprived. *In the Interest of LaRue, supra; In the Matter of DeSavage, supra.* The question whether the child is without proper parental care or control, *i. e.*, is he deprived, actually includes two questions, " 'Is the child *at this moment* without proper parental care or control?'; and, if so, 'Is such care or control *immediately available*?' " *In the Interest of LaRue, supra*, 244 Pa.Super. at 233, 366 A.2d at 1278 (emphasis in original). To make the latter decision, it may be necessary for the hearing court to look to the future.

Appellants do not dispute this conclusion, but rather, contend that the evidence to prove deprivation was not clear and convincing because too many questions were left unanswered, e. g., why the hospital permitted William Lee to be released if his condition was as evident as the nurse testified, why the parents were never charged with the death of Ida Marie or supervised more carefully by CWS in their care of William Lee after her death, and why the condition of the home they purported to offer to James Albert at the date of the hearing was not investigated to make a finding on its suitability. We disagree and find the evidence sufficient.

■ There was abundant evidence from which the hearing judge could conclude that the deaths of both William Lee and Ida Marie were the result of improper care and precautions by appellants. According to Nurse Zeman's testimony, pneumonia need not be fatal if treated properly by keeping the patient warm and using medicine. There is no dispute that the prescribed medicine was not procured, and other evidence indicated that the child slept outside in a car on a very cold night. No plausible explanation was offered by appellants for this lax treatment of their child. An explanation for the failure to observe what should have been very visible symptoms of dehydration in Ida Marie is also notably lacking.

■ Furthermore, a deprivation hearing should not be "employed as an *ad hoc* inquisition into the adequacy of the services provided by Child Welfare Services. At such a hearing it is irrelevant, for example, whether 'more extensive efforts by CWS [could] have preserved the integrity of the family.'" *In the Interest of LaRue, supra,* 244 Pa.Super. at 236, 366 A.2d at 1280 (Cercone, J., concurring). Similarly, that criminal charges against the parents for the death of Ida Marie were not filed does not affect the inferences drawn by this court from an examination of the circumstances surrounding that death. The failure to file charges is irrelevant to our inquiry.

The evidence concerning the physical environment appellants could likely provide for James Albert was also clear and convincing. Testimony from witnesses who viewed the dwellings at the time appellants occupied them was corroborated by photographs. Although the photographs of the Dunbar home were taken subsequent to appellants' departure, the testimony concerning the date of their departure, even if not completely certain, indicates that the house had been vacant at most a week or so. This lapse of time was not sufficient to drastically change conditions, and those witnesses identifying the photographs stated that they accurately depicted the conditions they observed while appellants were living at those addresses. *See Hamilton v. Fean*, 422 Pa. 373, 221 A.2d 309 (1966); *Med-Mar, Inc. v. Dilworth*, 214 Pa.Super. 402, 257 A.2d 910 (1969). Conditions at these homes were indeed so deplorable that they constituted a lack of "care or control . . . necessary for [the child's] physical, mental, or emotional health," 11 Pa.C.S. § 50–102(4)(i), *substantially reenacted*, 42 Pa.C.S. § 6302, and the hearing judge properly used this evidence as a ground in determining that James Albert is a deprived child.

Ms. Ohler did testify that preparations were being made to move to Connellsville to live with Mr. Black's mother, and appellants contend that the court should have undertaken an investigation of this home before making the custody determination. A home study was not conducted by CWS because they had only been notified that appellants were considering moving, and no exact address had been provided. Furthermore, the promise to arrange a secure home stands solely on appellant Ohler's word since she presented no evidence to the hearing court to corroborate the promise. Appellant Black's mother was not brought forward by appellants to testify to her agreement to open her home to them and to aid in the care of James Albert. The welfare of the child at the time of the hearing is the controlling consideration, *see Commonwealth ex rel. Rogers v. Daven*, 298 Pa. 416, 148 A. 524 (1930); *Commonwealth ex rel. Shipp v. Shipp*, 209 Pa.Super. 58, 223 A.2d 906 (1966),

and although in the instant case we must consider prognostic evidence, we will not speculate to this extent.

This case is distinguishable from *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972), in which the court during a custody battle was faced with the mother's promise that the departure of the man, not her husband, with whom she was living, was imminent. Our supreme court saw fit to grant a remand for a hearing to determine if he had indeed departed and to reexamine the home environment. In *Holschuh*, however, the appellate briefs indicated that the man had indeed moved, and described the new home the mother had established. Furthermore, the mother had not been found unfit. Besides lacking a secure home, appellants have been found to lack a general concern for their child and an understanding of their responsibilities in raising him. We also have no indication in the briefs that appellants have moved as promised. In light of these facts, we would be invading the fact-finder's province to disagree with his conclusion that "these parents have not been able to maintain 'a minimum standard of care' in the past, and there has not been any evidence to show that their performance would improve in the future." (Slip opinion at 8).

Having concluded that James Albert is a deprived child within the meaning of the Juvenile Act, we must still confront the issue of the necessity of removing the child from his family. More accurately, the question should be phrased, "Since the hearing judge has found that it was necessary to separate [the child] from [his] parents, and since he arrived at that finding after the most careful procedure, should we not defer to that finding?" *In the Interest of Clouse, supra*, 244 Pa.Super. at 407, 368 A.2d at 785. Appellants argue, similarly to their contentions discussed above, that the hearing judge did not make sufficient findings to support his conclusions that the child should be separated from his parents. They insist that the inquiries suggested in *In the Interest of LaRue, supra*, 244 Pa.Super. at 231, 366 A.2d at 1277, were not considered by the hearing judge. Once again we must reject the argument.

In *In the Interest of LaRue*, this court stated that the hearing judge should determine the source of difficulties within the family with which he is dealing, asking whether they come from within due to a lack of understanding or resources, or from without due to sickness or economic problems. "In one case, the judge may find that the natural family retains enough vitality to require the attempt to preserve it, in another, that as the child's personal history has evolved, it neither has nor can expect to have a natural family able to afford it the security and love it needs." *Id.* The hearing judge explicitly states his awareness of the family interests at stake, but by the evidence finds that appellants do not understand their duty to their child and are unable to afford him the necessary security because of their inability to maintain a minimum standard of care or a secure home. Although appellants have intimated that some of their problems have been caused by a lack of intensive or continuous efforts by CWS, the hearing judge's conclusion that the failure was due to a lack of co-operation on *appellants'* part is completely supported by the record. Clearly, since appellants will not allow themselves to be helped to understand and undertake their responsibilities, no alternative exists but to remove the child.

Other guidelines suggested by this court in *In the Interest of LaRue* to aid in deciding whether the vitality of the family is strong enough that separation may not be necessary, support the decision to remove James Albert. First, the age and mental development of the child must be taken into account because an older child can understand disruptive changes while for young children continuity is more important. To take this infant and place him in appellants' hands would place the welfare of the child in jeopardy because no evidence was presented to show any imminent or future change in their capabilities to provide for the child. It is also appropriate to examine the extent to which the relationship with the parents has been preserved. Instantly, there will be no painful severing of a natural family tie felt by the child since he has never been in the care of his parents.

Although his decision was a difficult one, the trial judge made it on the basis of a comprehensive hearing and a searching examination of the testimony, yielding a competent and well-reasoned opinion. Our judgment, therefore, must not be substituted for that of the hearing court. Should the circumstances of appellants change, such as with the establishment of a secure home, a new proceeding may be brought challenging the custody award, *see Stapleton v. Dauphin County Child Care Service, supra,* because in the interest of safeguarding the permanent welfare of the child, decrees concerning children are temporary and subject to modification to meet changing conditions. *In re Custody of Phillips,* 260 Pa.Super. 402, 394 A.2d 989 (1978); *Commonwealth ex rel. Thomas v. Gillard,* 203 Pa.Super. 95, 198 A.2d 377 (1964).

In accord with the above reasoning, we affirm the order of June 5, 1978, finding the child, James Albert Black, to be deprived and awarding his custody to CWS.