534 A.2d 782

In re TAMEKA M., a minor.

Appeal of CHILDREN AND YOUTH SERVICES OF
ALLEGHENY COUNTY.

Superior Court of Pennsylvania.

Argued Dec. 9, 1986.

Filed Oct. 30, 1987.

Reargument Denied Dec. 23, 1987.

526

James A. Esler, Pittsburgh, for appellant.

Before CIRILLO, President Judge, and ROWLEY, OLSZEWSKI, DEL SOLE, MONTEMURO, BECK, TAMILIA, KELLY and POPOVICH, JJ.

ROWLEY, Judge:

Children and Youth Services of Allegheny County (CYS) appeals from an Order of the juvenile court directing CYS

to reimburse foster parents for tuition paid by them to enroll Tameka M. in a Montessori preschool program, and to pay the cost of her continuing education in that program. The case was certified for en banc review to consider the following issues of first impression raised in a dependency proceeding under the Juvenile Act, 42 Pa.C.S. §§ 6301–6365: 1) is the order directing CYS to fund the foster parents' placement of a dependent child in preschool final and appealable; and 2) does a juvenile court judge have authority to order CYS to a) fund the child's placement in a non-therapeutic preschool not licensed by the Pennsylvania Department of Public Welfare (DPW), and b) fund the child's placement in a preschool for which funds are not reimbursable from DPW. To place the issues in proper perspective, we must first consider the facts and procedure that preceded this appeal.

Tameka, born January 21, 1981, was adjudicated dependent by the juvenile court and placed under supervision of CYS in March of 1983. Tameka was placed in the custody of a friend of Tameka's natural mother. The placement proved problematic and within two weeks Tameka was placed with a foster family who had earlier received Tameka's younger brother, Brian.

During this time period Tameka's natural mother was directed to enroll in a program designed to assess her parenting skills and to facilitate the return of Tameka and Brian to her. She has, however, failed to follow through with the program and is no longer involved with her children. The permanent plan for both children is adoption. Tameka's natural father has never appeared in any of the proceedings before the juvenile court.

A review of Tameka's placement with the foster parents was held on August 31, 1984. During the hearing, the issue of payment for Tameka's attendance at preschool was considered. Testimony presented at the hearing revealed that in August of 1983 Tameka had been referred to the Parent–Child Guidance Center (Guidance Center) because of self-abusive behavior such as picking at her arms, nose and

upper lip until they bled. After an evaluation, the Guidance Center recommended that she be placed in the South Hills Therapeutic Preschool where she was enrolled in September of 1983. The South Hills preschool was funded through Mental Health/Mental Retardation and involved no cost or expense to CYS. In December of 1983, the foster mother removed Tameka from the South Hills preschool because, according to her, Tameka's behavior had deteriorated; for example, her screaming and tantrums had escalated. The foster mother also believed that Tameka was spending too much time at the school, causing her sleeping pattern to be interrupted. The foster parents then enrolled Tameka in a Montessori preschool in an effort to provide a more structured program for the child. The foster mother testified that Tameka's behavior improved after the transfer. The cost of the Montessori program was originally $70 per month, but had been increased to $80 per month at the time of the hearing. The foster parents had been paying the tuition for the Montessori school. At the review hearing, the foster parents sought reimbursement from CYS for Tameka's attendance at Montessori. Because CYS would receive no reimbursement from DPW for Tameka's attendance at Montessori, the agency opposed paying her tuition there.

After reviewing the testimony of the caseworker and the foster mother, and a psychological report based on an evaluation of Tameka conducted four months after she enrolled at Montessori, the juvenile court ordered CYS to reimburse the foster parents for Tameka's attendance at Montessori. Although the court acknowledged the financial limitations of CYS, it found that Tameka's masochistic behavior demonstrated that she had both special problems and special needs. The court noted that her behavior had deteriorated in the South Hills program, but had improved in the Montessori one and therefore the Montessori program was best suited for her special needs. The court concluded that the highly structured program at Montessori was therapeutic as well as educational and that enrollment

there was in Tameka's best interest. This direct appeal followed.

## I.

The first issue to be resolved is whether the order is appealable. Although none of the parties have raised the issue, it is incumbent upon us to address the matter sua sponte. *Fried v. Fried,* 509 Pa. 89, 501 A.2d 211 (1985); *Metropolitan Life Insurance Co. v. Bodge,* 352 Pa.Super. 191, 507 A.2d 837 (1986). When the case was certified for en banc review, the parties were directed to address the appealability issue. Both parties argue that the order is appealable. Although CYS did not file a supplemental brief on the issue, it urged us, at oral argument, to so find. The child advocate assumes that the order is interlocutory, but argues that a prompt appeal best serves the interest of justice in a juvenile case and that waiting for a final order could preclude appellate review due to the length of time which may elapse before a final disposition is reached in the trial court in a dependency case.

To resolve the appealability question we first consider whether the order is a final one. Tameka was found to be dependent as that term is defined in the Act and a dispositional order was entered. An appeal cannot be taken from a dependency determination; instead, an aggrieved party must wait until an order of disposition is entered. *In Interest of K.B.,* 276 Pa.Super. 380, 419 A.2d 508 (1980) (by Spaeth, J., with Hoffman, J. concurring in the result, and Van der Voort, J. dissenting.); *In Interest of C.A.M.,* 264 Pa.Super. 300, 399 A.2d 786 (1979). In the present case, no appeal was taken from the dispositional order. Therefore, the case will remain active until one of the following events occurs: 1) Tameka is returned to her natural parent(s); 2) parental rights are terminated and Tameka is adopted, *see In re D.K.W.,* 490 Pa. 134, 415 A.2d 69 (1980) (once court terminated parental rights under the Adoption Act, issue of custody under Juvenile Act became moot and it was unnecessary to make a finding whether the minor was depend-

ent), or 3) Tameka attains majority. The present plan for Tameka is adoption. Viewed in this context, the order directing CYS to pay for Tameka's placement and continued enrollment in the preschool program at Montessori is not a final order, but is interlocutory. "[A]n order is final where it puts a litigant out of court or otherwise terminates the litigation by precluding a party from presenting the merits of a claim or defense to the trial court." *Fidelity Bank v. Duden*, 361 Pa.Super. 124, 128, 521 A.2d 958, 960 (1987) (citations omitted). The present order achieves none of these results.

■ In addition to the fact that the order is interlocutory because the parties are not out of court and there has been no final disposition, it has been suggested that the appeal is premature because CYS has not been adjudged to be in contempt of the order and no sanctions have been imposed. Two cases are cited in support of this proposition: *Hester v. Bagnato*, 292 Pa.Super. 322, 437 A.2d 66 (1981) and *McManus v. Chubb Group of Insurance Companies*, 342 Pa.Super. 405, 493 A.2d 84 (1985). In *Hester*, the Appellees requested that Appellant be held in contempt of an order enforcing a settlement agreement. A hearing was held on the petition for contempt and Appellant appeared with counsel at the contempt hearing. The trial court entered an order finding Appellant in contempt for refusing to obey a prior order enforcing the settlement agreement. An appeal was taken and this Court quashed the appeal, holding that until sanctions are imposed pursuant to an order of contempt, the order holding a party in contempt is interlocutory. In *McManus*, plaintiff appealed from an order holding her in contempt and assessing costs for her failure to abide by prior orders of court directing her to comply with discovery. This Court quashed the appeal, finding first that the order appealed from did not dismiss the underlying assumpsit action and that sanctions had not been imposed on the finding of contempt. Plaintiff, in that case, also argued that the assessment of costs, entered pursuant to Pa.R.C.P. 4019(g), was a final order. Applying the excep-

tion to the final judgment rule set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), this Court rejected plaintiff's claim, finding that the right to appellate review would not be lost if plaintiff waited until final judgment in the underlying assumpsit action.

After having carefully considered the applicability of the two cases cited to the present one, we conclude that they do not compel a finding that the entry of sanctions is a prerequisite to appealing from the order in question. In both *Hester* and *McManus* a *party* initiated the contempt proceedings when the contemnor failed to comply with an order of court directing them to perform an act: i.e., obey a prior order of court. Here, CYS has chosen to directly challenge the payment of school funds from the start, even before an order of contempt was sought or entered or a hearing was held on the matter. The underlying order was entered and a direct appeal was then undertaken by CYS. If this Court sua sponte were to require the initiation of contempt proceedings and the imposition of sanctions under the guise of considering the appealability issue, we would be encouraging foot dragging. The present order is complete in itself and orders CYS to pay a sum of money. Requiring contempt proceedings would add nothing to the record. Moreover, the current posture of the case reveals that if a finding of contempt and sanctions were required to make the present order appealable, CYS would have to first refuse to comply with the present order; appellee would have to initiate contempt proceedings; the trial court would have to hold a hearing and adjudge CYS in contempt of the order; and then sanctions could be imposed. *Matter of Elemar, Inc.*, 44 Pa.Commw. 515, 520, 404 A.2d 734, 737 (1979) ("Pennsylvania Supreme Court has said that the process necessary to hold one in civil contempt requires several steps—a rule to show cause, answer and hearing, rule absolute, hearing on the contempt citation, and adjudication of contempt."). Thus, we conclude that the absence of the entry of sanctions does not preclude a finding that the present order is appealable. However, this leaves us

with the question of whether the present order is appealable even though it is interlocutory.

We find that the present order is appealable under the exception to the final judgment rule set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), adopted in Pennsylvania in *Bell v. Beneficial Consumer Discount Company*, 465 Pa. 225, 348 A.2d 734 (1975), and recently reaffirmed in *Fried v. Fried*, 509 Pa. 89, 501 A.2d 211 (1985):

> In *Cohen*, the Supreme Court of the United States carved out an exception to the final judgment rule for situations where postponement of appeal until after final judgment might result in irreparable loss of the right asserted. Under *Cohen*, an order is considered final and appealable if (1) *it is separable from and collateral to the main cause of action;* (2) *the right involved is too important to be denied review; and* (3) *the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost. Id.* 337 U.S. at 546, 69 S.Ct. at 1226, 93 L.Ed. at 536.

*Fried*, 509 Pa. at 94, 501 A.2d at 214 [emphasis in original; quoting *Pugar v. Greco*, 483 Pa. 68, 73, 394 A.2d 542, 545 (1978)]. The *Cohen* test does not determine finality; instead, it creates an exception to the rule allowing appeals solely from final orders and applies only to orders which are interlocutory. *Fidelity Bank v. Duden, supra.*

As to the first requirement of *Cohen*, a review of the Juvenile Act reveals the following relevant purposes which the legislature sought to achieve by implementing the Act:

> (1) To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this chapter.
>
> \* \* \* \* \* \*
>
> (3) To achieve the foregoing purpose[ ] in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interests of public safety.

(4) To provide means through which the provisions of this chapter are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced.

42 Pa.C.S. § 6301(b). The Act provides for a bipartite proceeding consisting of 1) an adjudication of dependency, § 6341, and 2) a disposition of the dependent child, § 6351. *Helsel v. Blair County Children & Youth Services*, 359 Pa.Super. 487, 519 A.2d 456 (1986). Thus, the main cause of action consists of a dependency determination and disposition. The primacy of the dispositional order is further reflected by the fact that it constitutes a final, appealable order. Here, the order of disposition was entered in March of 1983 and it was not until August of 1984 that the present order was entered. We find that the order directing payment of the preschool funds is clearly separable from and collateral to the order of disposition; therefore, it satisfies the first part of the *Cohen* test.

The second requirement of *Cohen* is that the right involved is too important to be denied review. The purpose of the order appealed from is to assure the continued attendance of Tameka in what the trial court perceives to be a beneficial and necessary preschool program for a ward of the court. The important right at stake is Tameka's proper mental development and receipt of the treatment necessary to insure that development, a matter which is one of the concerns addressed in the purpose section of the Juvenile Act. *See* 42 Pa.C.S. § 6301(b)(1). The failure to provide Tameka with proper treatment currently may result in a lasting problem for her. Thus, the right involved is too important to be denied review since Tameka should be provided now with the care necessary for her wholesome mental development.

The final requirement of *Cohen* is that if review is postponed until final judgment in the case, the claimed right will be irreparably lost. In *Fried v. Fried, supra,* our Supreme Court concluded that an order awarding interim counsel fees and expenses and payment of master's fees

and stenographic costs in a divorce action subject to the Divorce Code of 1980 did not meet the third requirement of *Cohen*. If it were determined that the trial court erred in making the award, the Court noted that the amounts paid under the interim order could be recovered by appropriate "adjustments in the final settlement via the equitable division of marital property, permanent alimony, and/or the final award of attorney's fees and costs." *Id.* 509 Pa. at 96, 501 A.2d at 215 (footnote omitted). *Compare Beasley v. Beasley*, 348 Pa.Super. 124, 501 A.2d 679 (1985) (order denying petition to bifurcate economic claims from cause of action for divorce not appealable under *Cohen* since right involved was not too important to be denied review and would not be irreparably lost) *with Katz v. Katz*, 356 Pa.Super. 461, 514 A.2d 1374 (1986) (order directing that hearings pertaining to equitable distribution of marital property be open to public is immediately appealable under *Cohen* due to fact that any information disclosed during hearings is not subject to recall and it would be impossible to recompense party for alleged harm resulting from disclosure of marital and financial circumstances).

In the present case, the right will be irreparably lost if review is postponed. To carry out the purposes of the Juvenile Act it is important to afford immediate treatment to a child subject to its terms. Although divorce proceedings, such as the one confronted in *Fried*, may last for many years, a dependency proceeding is unique since it presents a very real possibility that the case may continue until Tameka reaches majority. Even more important is the principle that a developing child be provided with the appropriate treatment immediately, otherwise he or she may suffer permanent damage. Unlike the parties in *Fried*, there is no amount of money that could repair such a tragedy. Although the foster parents have paid for Tameka's attendance at the Montessori school, there is no assurance that they can or will continue to do so. On the other hand, if the trial court was without authority to enter the order, as is argued by CYS, it is unlikely that CYS would be able to seek return of the money paid out pursuant to the

court order if review is delayed. There will be no fund available at the conclusion of a juvenile proceeding from which adjustments can be made if the order is reversed. Therefore, we hold that the order is appealable under *Cohen*.

## II.

Having determined that the order appealed from is properly before us, we now turn to a consideration of the merits of the two issues CYS has raised on appeal. CYS argues that a juvenile court judge does not have the authority to order it to fund a child's placement and enrollment in a non-therapeutic, Montessori preschool because (1) the preschool is not licensed by DPW, and (2) CYS will not be reimbursed by DPW for the placement.[1] Set against a backdrop of limited funding, CYS submits that because funding is not available to enroll dependent children in educational preschool programs, as opposed to therapeutic preschool programs, the court does not have the authority to order CYS to fund a preschool for all of its children. Instead, CYS argues, in unique situations such as Tameka's, special schools with Mental Health/Mental Retardation funding should be utilized. Alternatively, CYS submits that entry of the order constituted an abuse of discretion. Since it would be unnecessary to address the abuse of discretion claim if the trial court was without authority to enter the order initially, we first examine the claim concerning the court's authority to act.

The juvenile court found that the Act gives broad discretion to a judge in determining the appropriate disposition for a dependent child, including the authority to impose whatever conditions or limitations are necessary to meet the

---

1. CYS also argues that *In re Adoption of Crystal D.R.*, 331 Pa.Super. 501, 480 A.2d 1146 (1984) (foster parents do not have standing to petition for termination of natural parents' rights) should be extended to the present case so that the foster parents' rights are made subordinate to those of CYS which stands in *loco parentis* to Tameka. We need not consider this point because it is the juvenile court's order we are reviewing, entered after an evidentiary hearing, and not the foster parents' actions.

best interests of the child. Looking to the disposition section of the Act, the court viewed the order for the payment of school funds as a condition or limitation on the previously entered order of disposition. The disposition section provides in relevant part as follows:

Disposition of dependent child

(a) General rule.—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

42 Pa.C.S. § 6351. The court noted that CYS was required to 1) provide services and care ordered by the court under the Act, 55 Pa.Code § 3130.34(4); *In re Lowry,* 506 Pa. 121, 484 A.2d 383 (1984); 2) financially support its dependent children, *Schade v. Allegheny County Institution District,* 386 Pa. 507, 126 A.2d 911 (1956); and, 3) develop and carry out a treatment plan consistent with the dependent child's individualized needs, *Janet D. v. Carros,* 240 Pa.Super. 291, 362 A.2d 1060 (1976).

In response to the final point, CYS maintains that a treatment plan tailored to Tameka's specialized needs was already in place when she attended South Hills Therapeutic Preschool and that Montessori is a non-treatment facility. CYS argues that the trial court's reading of the Juvenile Act and of the Supreme Court's decision in *In re Lowry* are overly broad. Specifically, CYS submits that the trial judge misconstrued the dispositional section of the Act by reading it to allow him the authority to impose "whatever" conditions were necessary to carry out the ordered disposition. It is submitted that the legislature limited the phrase disposition, and the judge's discretion, to the residential placement of the dependent child, which was the subject at issue in *Lowry*, and not to the payment of tuition for attendance at school programs.

The child advocate argues that the disposition and purpose sections of the Juvenile Act authorize the entry of the present order and that the trial court found that placement of Tameka in Montessori was in her best interest. It is argued that the order is a condition and limitation on her placement in the foster parents' home as contemplated by the disposition section of the Act and that whether CYS is reimbursed by DPW for the tuition is rendered legally irrelevant by *Lowry* in assessing the authority of the juvenile court to enter the order. The child advocate further argues that because the order appealed from also ordered Tameka to remain with the foster parents, the order constituted a disposition under § 6351(a)(2)(i). Therefore, it gave the foster parents legal custody of Tameka and conferred the rights and duties of a legal custodian as set forth in § 6357. It is claimed that under § 6357 the foster parents are charged with the duty of providing for Tameka's education.

CYS' argument raised a fundamental question as to the extent of the authority the juvenile court may exercise over a child subject to its jurisdiction in a dependency proceeding and the court's authority to order CYS to act. To define the

extent of that authority, and to resolve the issues raised on appeal, we look to *Lowry* and the Juvenile Act.

*In re Lowry* presented our Supreme Court with the issue of whether the juvenile court had the authority under § 6351 of the Juvenile Act to order CYS to supervise and fund a court-ordered transfer of legal custody of a dependent child to an individual without the prior certification of the individual's home as an approved foster-care home. CYS had opposed entry of the order because without certification it could not be reimbursed by DPW for the cost associated with the placement. The trial court had transferred custody of the dependent children to the individuals under § 6351(a)(2)(i). Our Court had determined that the juvenile court was without authority to either place the children in uncertified homes, or to order CYS to supervise and fund such placement because DPW regulations required certification before the child could be placed in the foster home. The Supreme Court rejected this decision, finding that the rule-making authority of DPW, as delegated by the legislature, was binding only on CYS, not the juvenile court, *see* 62 P.S. § 703, and that the plain language of § 6351(a)(2)(i) required that the qualifications of the individual seeking custody are to be judged by the court.

> In ordering a disposition under Section 6351, the court acts not in the role of adjudicator reviewing the action of an administrative agency, in which case, the regulations promulgated to bind that agency could not be ignored; rather the court acts pursuant to a separate discretionary role with the purpose of meeting the child's best interests.

*Id.* 506 Pa. at 127, 484 A.2d at 386. The Court then considered the question of whether the juvenile court had the authority to order CYS to supervise and fund the placements. The Court noted that the Public Welfare Code and Public Welfare regulations imposed a duty on CYS to provide services and care when ordered to do so by the juvenile court pursuant to a dispositional order. Thus, the

Supreme Court concluded that the court had the authority to enter the orders in question. In considering the fact that DPW regulations did not provide reimbursement for placement in unapproved facilities, the Court pointed out that this fact did not preclude the juvenile court from entering the order, and that any disposition of a dependent child is "guided by the overriding principle of acting 'to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this chapter.' 42 Pa.C.S.A. § 6301(b)(1)." *Id.*, 506 Pa. at 130, 484 A.2d at 388. The Court noted that its conclusion would help the foster parents meet the expense of caring for the dependent child and would expedite the county's certification of the home so that it would be able to seek reimbursement from DPW for the placement.

In arguing that *Lowry* and the disposition statute are limited to where the child is placed, CYS seeks to capitalize on the following distinction between *Lowry* and the present case: in *Lowry* the order appealed from was a dispositional order transferring legal custody of the dependent child to the foster parents; in our case the order directs CYS to pay school funds. Based on the language of the Act, the purposes which the Act seeks to achieve, and the temporary nature of foster care, we find that the difference between the orders is immaterial in resolving the issues raised on appeal.

The Act itself provides that an order of disposition entered under § 6351(a)(1) or (2) may be made "subject to conditions and limitations as the court prescribes...." This language is repeated in the section of the Act setting forth the rights and duties of the legal custodian.

A custodian to whom legal custody has been given by the court under this chapter has the right to the physical custody of the child, the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training, and education, and the physical, mental, and moral welfare of the child, *subject to the*

*conditions and limitations of the order* and to the remaining rights and duties of the parents or guardian of the child.

42 Pa.C.S. § 6357 (emphasis added). The language evinces the legislature's intent that a juvenile court judge's order of disposition need not be limited to where the dependent child is housed, but that the order may provide for, inter alia, the wholesome mental development of the child. *See* § 6301(b)(1); § 6351(a). *Lowry* establishes that this is one of the overriding concerns of the Act. If Tameka had exhibited behavioral problems before the dispositional order was entered, the statute explicitly provides the court with the latitude to order that she receive treatment for the problem as a condition of the disposition order. We see no reason to make a distinction in the present case merely because Tameka began to exhibit problems after the order of disposition was entered.

Foster care is, by its very nature, temporary and it has been characterized as a state of limbo. *In re Angry*, 361 Pa.Super. 180, 522 A.2d 73 (1987); *Priester v. Fayette County Children and Youth Services*, 354 Pa.Super. 562, 512 A.2d 683 (1986); *In re Damon B.*, 338 Pa.Super. 597, 488 A.2d 53 (1985). *Accord In re E.F.V.*, 315 Pa.Super. 246, 461 A.2d 1263 (1983) (DPW has promulgated policy that no child should be allowed to drift in an out-of-home placement without the specific decision that he or she will be returned to his parents or be freed from parental custody and placed for adoption). In both *In re Frank W.D.*, 315 Pa.Super. 510, 462 A.2d 708 (1983) and *In Interest of Black*, 273 Pa. Super. 536, 417 A.2d 1178 (1980) this Court noted, in dicta, that to safeguard "the permanent welfare of the child, decrees concerning children are temporary and subject to modification to meet changing conditions." *Black*, 273 Pa. Superior Ct. at 549, 417 A.2d at 1185. Further, the present issue arose during a regularly scheduled review hearing of Tameka's placement.

■ In light of the realities of foster care, it is essential that the juvenile court exercise its authority over the de-

pendent child until the case is finally concluded so that the child's best interests are met despite changes in the child's condition or environment. The juvenile court's jurisdiction over a dependent child does not end with the entry of an order of disposition. To hold otherwise would place unfettered discretion in the hands of CYS, or any individual receiving temporary custody of a dependent child under an order of disposition, to make many of the important decisions concerning the child. One of the purposes of the Juvenile Act is "[t]o provide means through which the provisions of this chapter are executed and enforced...." 42 Pa.C.S. § 6301(b)(4). By finding that the court has the authority to enter the present order, we advance one of the purposes of the Act which is to provide for the wholesome mental development of the child.

We hold that the Supreme Court's holding in *Lowry,* that the juvenile court is not bound by DPW regulations and that it may order CYS to act, applies with equal force to a decision concerning the payment of school tuition and that the trial court had the authority to enter the order here under review.

■ We now turn to CYS' argument that the order constituted an abuse of discretion. CYS argues that the juvenile court erred in considering the convenience of the foster parents in entering the order. This claim is apparently based on the fact that the foster mother testified that Montessori was within walking distance of the foster home. However, our review of the record fails to reveal that the trial court gave any consideration to this factor. It is also suggested that the trial court misconstrued a psychological report on Tameka in arriving at its decision. At the hearing, CYS introduced a psychological report prepared by a clinical psychologist four months after Tameka had enrolled at Montessori. According to the court, the report indicated that Tameka benefitted from a highly structured preschool program and that she should continue to be involved in such a program. The court noted that although the report did not mention Montessori by name, it could infer that the

psychologist considered the program in her recommendation because Tameka was enrolled there at the time, the foster mother had discussed the Montessori program with the psychologist during the evaluation, and Montessori fits the description of a structured program. After having reviewed the trial court's opinion and the testimony presented at the hearing held on August 31, 1984, we conclude that the trial court properly considered the psychological report in arriving at its decision.

Order affirmed.

TAMILIA, J., files a concurring and dissenting opinion in which DEL SOLE and POPOVICH, JJ., join.

TAMILIA, Judge, concurring and dissenting:

I have no quarrel with part one of the majority Opinion concerning the jurisdiction of this Court to hear the appeal. For the reasons stated in that section of the majority Opinion, I believe the appeal is not interlocutory in nature and is one of those special exceptions which requires this Court to make a determination. As to part two of the majority Opinion, I respectfully dissent.

The majority relies quite heavily on the Opinion of the Supreme Court in *In Re Lowry*, 506 Pa. 121, 484 A.2d 383 (1984), as support for the broad powers of a juvenile court judge, not only to place a child in a qualified foster home, but to authorize any treatment the court believes necessary for the child. In *Lowry*, the issue was whether a court had the power to place a child in a foster home it deemed appropriate when the court had found that home to be qualified to receive and care for the child, and Children and Youth Services refused to certify it for placement. The Supreme Court held this function was clearly indicated under 42 Pa.C.S. § 6351(a)(2)(i) of the Juvenile Act, which reads:

§ 6351 Disposition of dependent child

(a) General rule. If a child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental and moral welfare of the child.

(2) Subject to conditions and limitations as the court prescribes, transfer temporary legal custody to any of the following:

(i) any individual resident within or without the Commonwealth who, after study by the probation officer or other person or agency designed or designated by the court, is found by the court to be qualified to receive and care for the child.

The Supreme Court went on to find that certification of a home by the Department of Public Welfare, through its agency Children and Youth Services, required by the Department of Welfare regulations, 55 Pa.Code § 3700.68(b) and § 3130.39, and non-payment to a home if not certified under section 3140.21(c)(5), are binding only on Institution Districts and not the courts. It found ample authority in the Juvenile Act to permit the court to make placement outside these regulations. It finally determined that the qualifications of a foster home, when placement was needed, must ultimately be made by the court and could not be circumscribed by Department of Public Welfare regulations. This rationale was based on the need for expeditious placement or transfer of children, which might be obviated by requiring that placement be made only by or through an authorized agency. *See* footnote 4, pg. 387. It further buttressed its reasoning by holding that foster placements must be made available through the local institution district in accordance with statute, 62 P.S. § 2305, which provides:

the local authorities of any institution district shall have the power and for the purpose of protecting and promoting the welfare of children and youth, it shall be their duty to provide in foster family homes or child caring institutions adequate substitute care for any child in need of such care and, upon the request of the court to provide such service and care for children and youth who have been adjudicated dependent.

484 A.2d 387.

The sole issue in *Lowry, supra,* was the certification of a foster home as a qualified foster home for placement of a

child by the Juvenile Court. The Supreme Court found that authority was explicitly contained in the statute and the requirement of payment for the care of a child in the foster home was subsidiary and incidental to the power of the court to determine the qualifications of a foster home. The court, in effect, held that it was the court and not the Children and Youth Services which determined qualification and once qualification was established, then certification could follow. The court also found that there existed distinct and separate duties of the Department of Welfare and the Institution District to fund foster care placement.

In this case, the majority would expand that explicit power for placement of children in foster homes to permitting the Juvenile Court judge to authorize payment for education of a child without a determination that the facility was a treatment facility and, in doing so, unreasonably expands *Lowry* and imposes a serious threat to the orderly administration of treatment programs for the children, both dependent and delinquent, and subverts the responsibility of the administrative branch of government for fiscal management of the costs for the care and treatment of children.

This is not a situation as occasioned our review of *Janet D. v. Carros*, 240 Pa.Super. 291, 362 A.2d 1060 (1976). The *Janet D.* case clearly turned on whether the Juvenile Court could order an individualized treatment program for an extremely damaged child when the agency had failed to provide an adequate treatment program. The treatment to be provided for *Janet D.* was within the expectation and understanding of treatment as such. In this case, the agency had already provided a treatment program for the child that, in all respects, was designed to meet her needs, and which, in fact, cost substantially more than the educational program selected by the foster mother. It was funded through Allegheny County MH/MR, whereas the program selected by the foster parents met no funding criterion and would ultimately be funded from Allegheny County general funds.

This case raises three issues which have been little discussed by the majority. First is whether the court may order payment for education to any private school deemed appropriate by the foster parent. Second is whether a foster parent, under the Juvenile Act, is the true "legal custodian" of the child as opposed to the Children and Youth agency. Third is whether the record justifies a finding that the program adopted by the foster mother was a better program or met the needs of the child more fully than that provided by the agency.

As to the first, no evidence was presented that the school which the foster parents selected, a Montessori school, was anything but a highly-structured, educational program. It is licensed by the Department of Education and is not licensed for treatment. As such, it cannot be distinguished from scores of other schools, private in nature, which provide education for preschoolers whose parents want a more formal and structured preschool program than would otherwise be the case. The foster mother selected this program based on consultation with friends whereas Children and Youth Services based its placement with South Hills Therapeutic preschool program upon evaluations and recommendations by The Parent–Child Guidance Center specialists involved in planning for and treating this child. Foster placement of a child, who is a ward of the agency mandated to provide the supportive services necessary for placement of children and for monitoring their care and treatment as directed by the court, does not imbue the foster parents with an unlimited right to prescribe the care, treatment or the control of the child. Should there be no restriction other than that which might be imposed by a court Order, there would be no limitation to the placement and treatment of the child in accordance with the individual tastes, preference or whims of the foster parent. Aside from the effect on the child, it negates the responsibility of the agency to provide broad based uniform treatment (as well as individualized treatment), and the impact this would have on agency management and the tax burden would be chaotic. This was clearly recognized by the trial court in

terms of its overall implications, although in this case, the actual impact would be less on the tax payers than the planned proposed by the Children and Youth Services.

With older children in foster care, possibilities for independent action by foster parents are even greater when it is accepted that virtually all children in placement have some emotional and school difficulties and dissatisfaction with some, if not most, community schools and treatment programs is not uncommon. In particular, emotional and educational problems that are school related require expert evaluation, testing and program matching; placement by a foster parent, without supporting testing and knowledge of the appropriateness of a particular program, cannot be encouraged as does the majority by its position here.

What parent, foster or otherwise, would not prefer Ellis School, Sewickley Academy or Shadyside Academy over a local school. Should the foster parent be Roman Catholic in faith, a strong preference for a Catholic school as opposed to a public school might be indicated. Likewise, persons of other faiths, whether it be Lutheran, Jewish, Jehovah Witness or Fundamentalist, might be predisposed toward enrolling the child in schools of their preference to provide structure that could be missing, according to their beliefs, in other schools. The point that must not be lost is that the average parent in the community, who is not subject to Juvenile Court control or the Children and Youth Services programming, might likewise want better schooling or treatment for its child, but would have to make a decision as to whether it could afford that treatment or not, and based on the realities of the economic situation, would do whatever was best under those conditions. As likely as not, this would result in utilizing the services of the school or treatment program that serves the need but is within their means as opposed to the best that is available.

Children and Youth Services has a similar responsibility, and it should not be arbitrarily put aside by foster parents. Considering that Allegheny County C.Y.S. has 1,731 children in placement out of the 10,114 children under supervi-

sion, the problems of monitoring, assuring treatment and funding would be astronomical and insurrmountable.[1] While *Lowry, supra,* correctly pointed out that the state and the Institution District both have funding responsibility, Act 148 places responsibility on the legislature to fund children's programs up to 75 per cent of their costs.[2] Each year, the state has failed to meet its match to a greater extent so that for fiscal year 1986–87, the projected Allegheny County overmatch is $8,500,000, and for fiscal year 1987–88, it is projected to be $20,000,000 (C.Y.S. Budget Projections 1987–88). Statewide children's services are in crises with county budgets and a limited tax base with caps on millage rates being strained to the breaking point. It must be left to the County Administrators how best to spread finite funds so all children get equal treatment, rather than having foster parents or judges provide special treatment on a case-by-case basis.

The second consideration concerns whether a foster parent is the true legal custodian as opposed to custody being awarded to the agency for placement of the child with foster parents. The majority buttresses its position that the foster parents acted appropriately in placing the children in the Montessori program by pointing to 42 Pa.C.S.A. § 6357, Rights and duties of legal custodian. That section states:

§ 6357. Rights and duties of legal custodian

A custodian to whom legal custody has been given by the court under this chapter has the right to physical custody of the child, the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training, and education, and the physical, mental, and moral welfare of the child, subject to the

---

1. Chart IV, A.C.Y.S. Report, Number and Percent of Children Receiving Service from ACYS 3-31-87 (foster home–749, adoptive home–207, subsidized adoption–329, group home–98, institutions–251, shelter–97, total = 1,731.

2. 62 P.S. § 701 *et seq.;* §§ 704.1, 704.2, 709; Article VII Children and Youth. *See also* 55 Pa.Code 3140.1 *et seq.*

conditions and limitations of the order and to the remaining rights and duties of the parents or guardian of the child.

Section 6302, Definitions, provides:

Custodian is defined as a person other than a parent or legal guardian who stands in loco parentis to the child or a person to whom legal custody of a child has been given by order of a court.

It would appear that under these sections, while the foster parents were "custodians", no specific Order of custody was made to the foster parents creating the status of "legal custodians" in this case. In contravention to the custody Orders involved in *Lowry, supra,* where the court made specific awards of custody to specific individuals, in this case, as is generally the case, the initial Order of court, dated March 4, 1983, provided that on a finding of dependency, "it is ordered that the child be placed under supervision of Allegheny County Child Welfare Services in the custody of Kim Reynolds, mother of the child, to enroll in "Begin Again" program, review on June 3, 1983." This is the only specific Order of custody to a person contained in the court record. By Order dated March 18, 1983, titled "Miscellaneous Order", after a review hearing, supervision remained with Children and Youth Services pursuant to the prior Order of March 4, 1983. The Order was amended so that the child would be "placed in foster care pending hearing and/or Order of the court if/and as required."

A non-specific Order of foster care does not designate a specific legal custodian and as such the agency would have the power to designate foster parents and if needed, to make changes when the situation required it. A change of foster parents could clearly be made without court approval or hearing and only if the nature of care, such as return to the parent or placement in an institution, changed, would court approval be required. Since ultimate control of the child, pursuant to court Order, resided with the agency, it was the agency that had legal custody, pursuant to section 6357, and not the foster parents. The care of the child is a

responsibility of the Children and Youth Services which has the right, under both law and Department of Welfare regulations, to determine the nature of care and treatment, protection, training and education and to provide for the physical, mental and moral welfare of the child through the foster care program. While it may be true that physical custody was given to the foster parents, it is inappropriate to determine care and supervision and right of placement in the agency to be less than a form of legal custody. Unquestionably, the Juvenile Court has the power to make an award of legal custody to foster parents directly, but unless the foster parents are designated as such, it is difficult to see how this can be anything but a placement controlled by the agency in which primary legal responsibility resides. Section 6357 is a general section providing for placement, through the Juvenile Court, of both delinquent and dependent/deprived children. Legal custody may be awarded to an agency, individual or institution. Delinquency placements are usually directed to individuals, programs or institutions, with no intermediary. Dependency placements are usually to the Agency as an intermediary. Mental health placements may be to institutions or programs. This section, therefore, establishes the needed flexability to provide legal custody to institutions and individuals which can assume virtually all responsibility for care, and to the agency, which must assume much of the programmatic responsibility despite physical custody being in foster parents.

In view of the broad mandate given to Children and Youth Services providing treatment services of all kinds and responsibility of the local government and Department of Welfare to provide funds and support for this program, unqualified legal custody in the foster parents cannot be maintained. Thus the majority reliance on section 6357, Rights and duties of legal custodian, extends too far in delegating to the foster parents the right to provide any and all services absolutely, as needed and required by the child. The interpretation placed on this section by the majority would relegate to the agency only the power to place, with no power to determine any of the numerous

treatment, educational and other matters needed to be dealt with in a given situation. 42 Pa.C.S. § 6351(a)(2)(ii) relating to the disposition of a dependent child states:

(2) Subject to conditions and limitations as the court prescribes (the court may transfer temporary legal custody to any of the following)

. . .

(ii) an agency or other private organization, licensed or otherwise authorized by law to receive and provide care for the child.

In this instance, the initial placement was to the care and supervision of Children and Youth Services, with authority by the court for placement in foster care. Thus the true legal custodian pursuant to section 6351 is the agency and not the foster parent.

In *In Re Davis*, 502 Pa. 110, 465 A.2d 614 (1983), the Supreme Court held that the definition of custodian in the Juvenile Act and the definition of legal custodian are separate and distinct. Custodian, in the definition of section 6302, in addition to holding, one "who stands in loco parentis" would apply also to a person awarded legal custody by a court. As we have said before, this definition is separate and distinct from the definition of legal custodian relied on by the majority. Legal custodian, for purposes of the Juvenile Act, may not include a foster parent unless legal custody has specifically been placed in that person by the court. This is made abundantly clear in the case of *In Re Adoption of Crystal D.R.*, 331 Pa.Super. 501, 480 A.2d 1146 (1984) (allocatur denied). In that case, this Court held, in interpreting section 6357, Rights and duties of legal custodian, that foster parents do not stand in loco parentis to the child nor are they legal custodians of the child. The court stated:

Plainly, foster parents, because they have physical custody of the child, are concerned with the child's day-to-day needs and, therefore, they do discharge many parental duties. However, it does not follow from this fact that

they thereby assume a status of in loco parentis to the child, distinguished by 'rights and liabilities ... exactly the same as between parent and child.' The reason that foster parents have physical custody is that it would be impractical for the agency to care for the child. The agency, while transferring physical custody to the foster parents, remains responsible for the care of the child and may, at any time required by the child's interests, regain physical custody and terminate the foster parent's relationship to the child.

*Id.*, 331 Pa.Superior Ct. at 505, 480 A.2d at 1148–49. The Court quoted directly from *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), where the United States Supreme Court said:

The New York system divides parental function, functions among agency, foster parents and natural parents, and the definitions of the respective roles are often complex and often unclear.[ ] The law transfers "care and custody" to the agency, ... but day-to-day supervision the child and his activities, and most of the functions ordinarily associated with legal custody, are the responsibility of the foster parent.[ ] Nevertheless, agency supervision of the performance of the foster parents takes forms indicating that the foster parent does not have the full authority of a legal custodian.[ ] Moreover, the natural parent's placement of the child with the agency does not surrender legal guardianship;[ ] the parent retains authority to act with respect to the child in certain circumstances [such as consent to surgery, consent to child's marriage, permit his enlistment in the armed forces or represent him at law]. Footnote omitted.

*Crystal D.R., supra,* 331 Pa.Superior Ct. at 509, 480 A.2d at 1150. This Court held the above quotation was specifically applicable to *Crystal* as the Pennsylvania Statute was virtually identical to the New York Statute.

Such distinctions are not uncommon in family law. Indeed, in the chapter on Actions for Custody, Partial Custody and Visition of Minor Children, Pa.R.C.P. 1915.1, Defini-

tions, the rules go into exhaustive detail in defining the intricate legal relationships involving custody. Rule 1915.-1(2)(b) provides:

> "Custody" means the legal right to keep, control, guard, care for and preserve a child and includes the terms "legal custody", "physical custody", and "shared custody".

Unquestionably, legal custody and physical custody may be divided under the custody and visitation rules in a similar fashion to that found in foster care placement. It, therefore, follows from the above discussion that the foster parent is not imbued by any custodial right to contract for programs, without the approval of C.Y.S., and thereby commit the agency to payment.

The third consideration, as stated above, is whether the record, in fact, supports the decision by the trial judge to permit the foster parents to make this placement and, therefore, to direct the agency to fund the placement as one that is appropriate for the child. In a different context and under different factual circumstances, it is without question that in view of the holding in *Lowry, supra,* and *Janet D., supra,* the court has the ability to direct the agency to provide an adequate program where it is clearly evident that the agency has failed in its responsibility and if the needs of the child required. However, that does not appear to be the case before us.

Here, we must be concerned with the interpretation of the trial judge that the best program for the child was, in fact, the program selected by the foster parents. The major complaints of the foster parents appear to be that the therapeutic program required more involvement by them in transporting the child to and from school and that the child had to stay at school for longer hours and was tired and fell asleep in transit, waking up cranky and evincing screaming—behavior which was hard to cope with. The improvement produced by withdrawing the child from the therapeutic program and placing the child in the Montessori School was that the child had shorter hours and was able to sleep

in the afternoons and the school was within walking distance of the foster parents' home presenting to them none of the transportation problems. The foster mother described the behavior as being improved but she agreed she could not really say the behavior was necessarily due to one school over the other. (T.T. 8/31/84, p. 18.) The trial judge relies on these statements from the foster mother to find that the child's behavior deteriorated in the M.H./M.R. funded program and it improved in the Montessori program and that this evidence was unrebutted. Judge Novak also relied on a psychological evaluation by Dr. Harway from which he "infers" the Montessori program would be a suitable program for the child.

Reading the record closely, it appeared the court was moving in the right direction up until the point where he drew inferences from the psychological report provided by Dr. Harway. It is significant that the court suggested *"before an appeal in this matter [there be] a conciliation, and I would call Dr. Harway and ask her if she thinks it is better to remove that child from the school and place her back in the therapeutic preschool or ask her if they think the child should remain in preschool."* (Emphasis added.) (T.T. 8/31/84, p. 38.) Thereafter, the discussion on the record was to the effect that Dr. Harway would be called, there would be a further evaluation and a decision would be made based on testimony developed with Dr. Harway. The report by Dr. Harway is definitive, with very specific and explicit directions as to how the child should be managed by the foster parents in terms of her masochistic and acting-up behavior. Dr. Harway also indicated the child needed a structured and organized environment *within the home and within the school where consistent orderly schedules and rules may be applied in an organized and predictable manner so that the child learns to derive some sense of security from the predictability of the important adults in her environment.* A final handwritten statement by Dr. Harway, in the report, is that continuation of preschool experience is strongly urged to give further help in providing socialization experiences which

this child very much needs. It is significant that the parental involvement with the therapeutic program was extensive and appeared to be questioned by the foster parents as focusing on them and not the child. (T.T. 8/31/84, p. 13.) The record discloses no component to the Montessori program that involves the foster parents. Since Judge Novak made a final Order directing that the child remain in the Montessori program, and that Children and Youth Services pay for this program, it appears his determination was made without the final step he himself suggested, that Dr. Harway present testimony as to which of the programs would most closely meet the needs of the child.

The comparison and the relative effectiveness of the two programs was not specifically dealt with by Dr. Harway in her report nor was there any evaluation of the change in the child's behavior alleged by the foster parents when the child was removed from the therapeutic program and placed in the Montessori school. It is conceivable the child improved because the foster parents were less tense as *their* needs were being met to a greater extent by having the child closer to home and having the child napping in the afternoon rather than being upset from the transportation and involvement in the counselling process. It is also a possibility that the child's worsened behavior while in the therapeutic program was the initial step in changing direction as behavior sometimes becomes worse as therapy begins. Nor was there any consideration of the effect of maturity and aging in relation to the child's behavior. Children at the preschool level change rapidly in behavior and adjustment even without involvement in programs. In situations such as these, the Juvenile Court judge is placed in a very difficult position as the inclination is to accept the word of the foster parents, who believe they are doing what is best for the child, but at the same time, retain an awareness that the treatment and programming for the child must remain subject to the control of the agency or the entire delivery system for services for children in these cases will disintegrate.

For that reason, the final and perhaps crucial step would have been to have Dr. Harway, who is respected as a child psychologist, present testimony on that crucial aspect of the case so that if the trial court was required to make an exceptional Order to provide treatment outside of the parameters established by the Legislative Scheme, the Department of Welfare, the Department of Mental Health and the Institution District for the care and treatment of a child, the evidence would have been conclusive.

Historically, by creation of the Children and Youth Services, subject to the legislatively mandated relationship to the Department of Public Welfare and regulations promulgated by the Department of Welfare, the extensive control for adjudication and treatment previously imposed by law in the Juvenile Court, was substantially altered. In the mid-sixties it was determined juvenile courts could no longer direct treatment and provide services in conjunction with the Institution District, for dependent children as their needs were far greater than a court, with its limited resources, could supply. The creation of Children and Youth Services was to fulfill the broad requirements and multiple service delivery systems, monitoring, protective services and the development of programs that are beyond the scope of courts to provide. While a court has the responsibility for adjudication and disposition, delivery of services lies with the agency in conjunction with the other systems derivative of the Department of Welfare, Department of Mental Health and the local county Institution Districts. The courts will never be required to stand by when the system fails to protect the best interests of the child and they may exercise their power to assure treatment for the child as we have indicated in *Janet D., supra.* However, the thin line between protecting the interest of the child and entering into the delivery of treatment processes by ordering the Department of Welfare to pay for systems which are not legally fundable or reimbursable goes beyond what is appropriate in cases such as these.

Courts must always be careful when they attempt to impose costs on administration of government agencies as the line dividing the executive, legislature and the judiciary, is one that should not be crossed. Even in such a critical matter as the adequate funding of court services, which was faced by the Supreme Court in the case of *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193 (1971) (affirming that the courts have the power to compel the legislature to provide sufficient finances to abide by the constitutional mandate that the judiciary shall be free and independent and able to provide an efficient and effective system of justice), the Court said the court does not have *unlimited* power to obtain from the city whatever sums it would like or believes it needs for its proper functioning or adequate administration. Its wants and needs must be proved by it to be "reasonably necessary." *Id.* Similarly here, the court, while it may desire to assess costs against the county Institution District (since the Department of Public Welfare will not reimburse) to provide services to children as it believes necessary, its power is not unlimited and *reasonable necessity* must be applied in making such a finding.

Here, the child had been placed in a therapeutic program that was funded through the Mental Health Services and would have provided no additional drain on the general fund of the Allegheny County Institution District since there was a mandated source for payment of these costs. It was not unreasonable for the agency to insist that the child be placed in programs which were properly funded. An additional hearing, with Dr. Harway's testimony on the record, would have been extremely helpful to all concerned in order to determine whether the request would have been reasonable or not.

I would add that Judge Novak is a distinguished and expert judge in the field of juvenile law and his proceeding in this matter was consistent with what we know to be a deeply concerned and committed approach to the difficult issues discussed above. It is possible that matters not of

record, of which we might have approved, justified his going forward with the Order. Because of the very substantial impact of this case on the entire delivery system of juvenile foster care, and the unknown implications for local budgeting and taxation which will flow from the erroneous finding of the majority, I must dissent.

I would, therefore, reverse the Order of the lower court and remand for further consideration of the appropriateness of the Order, consistent with the above.