J-A25036-24

2025 PA Super 21

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: DHS | : | |
| | : | No. 1543 EDA 2024 |

Appeal from the Order Entered June 3, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000028-2024

OPINION PER CURIAM:                               **FILED JANUARY 27, 2025**

The Philadelphia Department of Human Services ("DHS") appeals from the order discharging its petition for dependency of K.B. ("Child," born in December 2023) and returning legal and physical custody of Child to C.B. ("Mother"). For the reasons discussed below, we reverse and remand.

DHS first became involved with Mother in 2016, when she and her two older children ("Ma.B.," born in 2013, and "Miq.B.," born in 2015), were found living in deplorable conditions. *See* Dependency Petition, 1/30/24, at 1-2 (unnumbered). Neither child had up-to-date vaccinations or had seen a physician regularly; Miq.B. was suffering from a yeast infection, and Ma.B's body was covered in insect bites. *See id*. at 1-2. Additionally, Mother did not have weather-appropriate clothing for either child, what clothing she did have was dirty, and both children were "unkempt, filthy, and malodorous." *Id*. Mother also had a history of drug abuse and a drug-related criminal conviction.

*See id*. at 2-3 (unnumbered). The court adjudicated Ma.B. and Miq.B. dependent and terminated Mother's parental rights to the two children early in 2017. *See id*. at 2 (unnumbered).

Mother has a third child ("Mic.B.," born in January 2023), who, as of January 2024, lived with maternal grandmother ("Grandmother"). *See* Crisis/Rapid Response Family Meeting Report Conference, 1/17/24, at 1 (unnumbered). Sometime thereafter, DHS took custody of Mic.B. and filed a dependency petition on her behalf. *See* N.T., 6/3/24, at 5-9.

The Child at issue in this appeal was born in late December 2023 and remained in the hospital's neonatal intensive care unit for nearly two weeks because Child had breathing and feeding difficulties and needed a feeding tube. *See* N.T., 2/26/24, at 11-15. The hospital contacted DHS to express concerns Mother spent little time visiting Child and refused to feed him, incorrectly claiming Child was not hungry. *See* Dependency Petition, 1/30/24, at 2 (unnumbered); N.T., 2/26/24, at 6-7; 11-12. The hospital also noted Mother did not have an appropriate car seat base for Child and did not see the need to obtain one. *See id*. Upon investigation, DHS ascertained Mother was unemployed and homeless; at times she stayed with Child's maternal great-grandmother ("Great-Grandmother"),[1] who lived in a senior facility; at other

---

[1] Great-Grandmother's name is not included in the certified record.

times, she stayed with Child's uncle, Mother's brother, T.B. ("Uncle"). *See* N.T., 2/26/24, at 8; N.T., 6/3/24, at 13-15.

In January 2024, DHS obtained an order of protective custody ("OPC") for Child. *See* Order, 1/11/24, at 1 (unnumbered). At the shelter care hearing, the juvenile hearing officer determined it was not in Child's best interest to be placed with Mother, lifted the OPC, and ordered DHS's temporary commitment of Child to stand. *See* Recommendation for Shelter Care, 1/12/24, at 1-2.

A dependency hearing began in February 2024.[2] At the hearing, Tomeka Williams ("Ms. Williams"), an investigator for DHS, testified about her investigation. *See* N.T., 2/26/24, at 6-15. As Ms. Williams began to discuss the hospital's concerns regarding Mother's disinterest in visiting and feeding Child, the trial court interrupted, asking, "Why is this a dependency issue?" *Id*. at 7. Later, when Ms. Williams elaborated on Mother's refusal to feed Child while he was hospitalized, the trial court stated, "I don't find there's any dependency. The feeding stuff is irrelevant. The only [issue] that's relevant is the housing. . . . Get to something relevant." *Id*. at 15.

Ms. Williams noted Mother was living with Great-Grandmother at a senior living facility, but management could ask her to leave at any time. *See*

---

[2] Although represented by counsel, Child's father ("Father") did not appear at any of the proceedings and made it clear to DHS he has no interest in Child. *See* N.T., 2/26/24, at 11.

*id*. at 8-9. Ms. Williams explained Mother moved between Great-Grandmother's residence and Uncle's home, but Uncle failed the clearances. *See id*. at 13.[3]

Nakeem Addison ("Mr. Addison"), Mother's case manager at the Community Umbrella Agency ("CUA"), also testified at the hearing. *See id*. at 16-20. Mr. Addison confirmed Mother's lack of stable housing and noted Mother had no plan in place to remedy the situation. *See id*. at 17-18. The trial court interrupted Mr. Addison's examination and stated,

> I'm going to defer adjudication. This is a housing case, and nobody knows the status of [Mother's] housing. I'm going to defer adjudication. . . . No. Continue, but I'm telling you where I'm at. Unless you produce something — but he doesn't know. She doesn't know. It's going to be deferred. . . .

*Id*. at 17-18. Counsel for DHS asked the trial court to take judicial notice of the fact that Mother's parental rights to two of her children had been terminated. *See id*. at 20. The trial court refused to do so. It stated:

> That has nothing to do with this adjudication. That would come into play after I've adjudicated, but right now we're talking about whether or not you've met your burden and you haven't at this juncture, unless you make compelling argument.

*Id*.

The trial court also offered its speculation about Mother's housing:

> So, no person has [an] idea of the status of [Mother's] housing. She's staying with [Great-G]randmother. She might be staying

---

[3] Ms. Williams was presumably referring to the ChildLine clearances without which a person cannot be a suitable housing resource for a child. *See* 55 Pa.Code § 3490.4.

- 4 -

there for an indefinite period of time and [Great-Grandmother] may be allowing that. If that's the case, it's not dependen[cy].

*Id*. at 20-21. The trial court then continued the hearing. ***See id***. at 21-22.

After two continuances, the court reconvened the hearing in June 2024. Mr. Addison, the only witness, testified Mother had not been truthful when she said she was staying with Great-Grandmother. ***See*** N.T., 6/3/24, at 13. Rather, Mother was residing with Uncle. ***See id***. at 14. Mother was uncooperative and refused to provide contact information or an address for Uncle, so Mr. Addison had been unable to investigate the suitability of his residence. ***See id***. at 14-16. At this point, the trial court interrupted:

Let me interject . . . we initially had this adjudicate[ion] hearing on February 26th.

At this juncture, which is four months ago, any information or testimony with respect to adjudication would be stale, and you have to re-put that on the record because I don't have anything right now.

The only thing you have on the record right now is that [Mother] hasn't provided DHS with any address, but with respect to adjudication, I don't have anything else.

\* \* \* \* \*

You can put [Mother] has no housing, but you still need to put some information with respect to [Child[4]] and why [Child is] dependent, and right now I have nothing. I'm just letting you know that. Go.

*Id*. at 16-17 (footnote added).

---

[4] Although the court referred to "kids," only one Child as at issue.

The trial court sustained an objection to testimony regarding Mother's lack of employment. *See id*. at 18. The court speculated Mother, "could be living with [Uncle], and [Uncle] could [be] taking care of all the expenses. The children wouldn't be dependent." *Id*. at 18-19. The court also refused to permit DHS to elicit testimony regarding Mother's lack of involvement with her other three children, stating "[h]er other children are irrelevant. We're talking about this [C]hild." *See id*. at 19.

DHS offered the witness for cross-examination, but the court immediately declared it was "just going to discharge the case." *See id*. When counsel for Father asked if she would be allowed to cross-examine the witness, the trial court asked, "You don't really want to, do you?" *Id*. at 20-21. Counsel for Mother indicated she did not want to cross-examine the witness, but counsel for Child stated she intended to do so. *See id*. at 21. In response, the court stated, "I'm about to discharge this case. Did you listen to any – why are you cross-examining somebody? The testimony was – go." *See id*. The trial court immediately sustained objections to the three questions Child's counsel attempted to ask regarding Child's hospitalization after birth. *See id*. at 21-22.

The trial court discharged the dependency petition and directed physical and legal custody of Child be returned to Mother.[5]  This appeal followed.[6]

On appeal, DHS raises two questions for our review:

1. Did the trial court err as a matter of law and abuse its discretion in declining to adjudicate [Child] dependent, where it failed to conduct a comprehensive and searching inquiry of the record by arbitrarily precluding relevant evidence that Mother did not have the present ability to provide [Child] with proper parental care, including Mother's lack of safe and stable housing; Mother's evasiveness in preventing CUA from completing a court-ordered home assessment; Mother's disinterest and lack of involvement in [Child's] care at the hospital; and Mother's prior DHS involvement and involuntary termination of parental rights?

2. Did the trial court violate DHS'[s] right to due process where it prejudged the case before hearing all the evidence?

DHS'S Brief at 3 (unnumbered).[7]

In its first issue, DHS challenges the trial court's discharge of the dependency petition.  *See id*. at 16-24.

We begin with our standard of review.  This Court's standard of review for dependency cases requires that we accept the trial court's findings of fact and credibility determinations when supported by the record.  *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). The Court is not required to accept the

---

[5] It appears Child has remained in care during the pendency of the instant appeal.

[6] DHS and the trial court complied with Pa.R.A.P. 1925.

[7] Neither Mother nor Father filed a brief on appeal.  We note with extreme displeasure that the child advocate also did not file a brief.

lower court's inferences or conclusions of law and accordingly reviews for an abuse of discretion. *See id*.

A dependency hearing is a two-stage process governed by the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365. The first stage requires the court to hear evidence on the dependency petition and to determine whether the child is dependent. *See* 42 Pa.C.S.A. § 6341(a). Section 6302, defines a "dependent child," in part, as one who

> is without *proper parental care or control, subsistence, education as required by law, or other care or control* necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon *evidence of conduct by the parent . . . that places the health, safety or welfare of the child at risk*[.]

42 Pa.C.S.A. § 6302(1) (emphases added). This Court has held a child will be declared dependent when he is presently without proper parental care or control, and when such care and control are not immediately available. *See In re G.T.*, 845 A.2d 870, 872 (Pa. Super. 2004). Proper parental care has been defined as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (internal quotation marks and citation omitted). "The question of whether a child is lacking proper parental care and control encompasses two discrete questions: whether the child presently is without proper care and control, and if so, whether such care and control is immediately available." *In re M.W.*, 842 A.2d 425, 428 (Pa. Super.

2004) (citation omitted). In answering the first question, the paramount concerns is the "welfare of the child at the time of the hearing[.]" ***In the Interest of Black,*** 417 A.2d 1178, 1183 (Pa. Super. 1980). In answering to the second question, "it may be necessary for the hearing court to look to the future." ***Id***. at 1182.

A finding that a child is dependent requires proof by "clear and convincing evidence," *i.e.*, testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue." ***Matter of C.R.S.***, 696 A.2d 840, 843 (Pa. Super. 1997) (internal quotation marks and citation omitted). If the court finds a child dependent, it proceeds to the second stage of the dependency process, which requires an appropriate disposition based on the best interest of the child pursuant to section 6351 (a) and (b). ***See*** 42 Pa.C.S.A. § 6341(a), (c); ***see also In re B.S.***, 923 A.2d 517, 521 (Pa. Super. 2007).

A court in a dependency proceeding must conduct a "comprehensive and searching" inquiry into the record taking "evidence from all interested parties and also from objective, disinterested witnesses." ***In the Interest of Black***, 417 A.2d at 1181-82 (internal citations omitted). ***See In re Donna H.***, 602 A.2d 1382, 1385 (stating "the utmost concern is for the children's welfare and therefore nothing short of the comprehensive and searching inquiry into the facts mandated by decisions of this court will be acceptable")

(internal citations, brackets, and quotation marks omitted). This searching inquiry is necessary to ensure the trial court has a comprehensive view of the matter, is aware of all relevant concerns, and makes an informed decision. *See id*. at 1384-85 (remanding case for rehearing where the trial court refused to allow the child advocate or counsel for the child to cross-examine witnesses or present evidence and viewed the precipitating incident in isolation rather than looking at the entire history of the case).

It is long settled a "finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re E.B.*, 83 A.3d 426, 433 (Pa. Super. 2013) (citation omitted) (affirming the adjudication of dependency of an infant based on allegations the family's two older children were adjudicated dependent after physical abuse by father who was the subject of pending criminal charges). This Court has noted when dealing with an infant, the failure to allow prognostic evidence "would preclude a child welfare agency from ever seeking to have a newborn declared a [dependent] child, no matter how unfit or incompetent the natural parents are." *Matter of DeSavage*, 360 A.2d 237, 2024 WL 4945042, at *3 (Pa. Super. 12/03/24) (citing *DeSavage* and affirming adjudication of dependency based on prognostic evidence including evidence of Mother's failure to visit and learn to properly feed infant while the infant was hospitalized); *In re R.W.*, 826 A.2d 10 (Pa. Super. 2003) (affirming dependency adjudication of an infant based

on **DeSavage**, where the adjudication was based solely on prognostic evidence concerning Mother's prior abuse and neglect of her other children). This Court has specifically stated that a rule prohibiting a court from considering prognostic evidence and compelling the court to place the child with natural parents to determine if they can render proper care "ignores the possibility *that if the 'experiment' proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.*" **DeSavage**, 360 A.2d 242 (emphasis added).

DHS argues the trial court erred and abused its discretion by *sua sponte* precluding prognostic evidence regarding Mother's prior history with DHS and her actions during Child's hospital stay. **See** DHS's Brief at 18-20 (unnumbered). DHS maintains the trial court erred in relying on the Adoption Act, instead of the Juvenile Act, in concluding DHS did not meet its burden of proving dependency. **See id**. at 21. DHS contends the trial court erred in not finding Child dependent even though it acknowledged Mother's unstable housing situation and her refusal to cooperate with DHS. **See id**. at 21-24.

The trial court rejected DHS's arguments. It stated:

> In the instant case, [Mother's] housing status is still unknown. However, if [Child] and his sibling[8] are able to stay

---

[8] It is not clear to this Court why the trial court references Child's sibling (Mic.B.) in its decision. The record reflects while Mic.B.'s dependency petition was scheduled for a hearing on the same day as Child's, the trial court continued the case because Mic.B.'s biological father had not been served. **See** N.T., 6/3/24, at 4-12. Moreover, the record indicates the allegations

*(Footnote Continued Next Page)*

with [Great-Grandmother], there is nothing justifying an adjudication of dependency because the children will have appropriate housing at [Great-Grandmother's] house. [Mother] not having adequate and appropriate housing does not automatically mean that the children should be adjudicated dependent: the children could theoretically stay with a relative while [Mother] gets her affairs in order and there would be no dependency issue. Testimony . . . was that [Mother] was living in a senior living facility with [Great-Grandmother]. No evidence was presented as to where the children had been residing for the life of the case. . . . Regardless of [Mother's] current housing situation, the law is clear that a parent's rights shall not be terminated solely on the basis of environmental factors such as inadequate housing. . . [and] income. . . if found to be beyond the control of the parent. Here, testimony from the CUA worker is that [Mother] has been looking for employment and stable housing but has been unsuccessful due to reasons beyond her control. Thus, DHS failed to meet its burden of proving by clear and convincing evidence that finding housing and a job is within [Mother's] control.

\* \* \* \* \*

[T]here were no allegations that [M]other was unable to provide proper care and control of her children. DHS asserted that [Mother] should not have custody of [Child] solely due to [Mother] not having a job or appropriate housing. As discussed above, not having adequate housing or a job is not a reason to adjudicate a child dependent.

Trial Court Opinion, 8/16/24, at 5-7 (citations, record citations, and footnotes omitted, footnote added).[9] The trial court also maintained it correctly

_____

underlying Mic.B's dependency petition were not the same as those underlying Child's. **See id**. That the trial court included Mic.B. in this decision and appears to have prejudged her case, which involves different allegations, is entirely inappropriate.

[9] Later in its decision, the trial court contends it properly declined to find aggravated circumstances. **See** Trial Court Opinion, 8/16/24, at 10. We can
*(Footnote Continued Next Page)*

excluded the evidence from the February 2024 hearing at the June 2024 hearing as "stale." *Id*. at 8. Lastly, the trial court avers it properly excluded evidence of Mother's lack of care for her three other children as irrelevant. *See id*. at 9-10.

After a painstaking review of the record, we conclude the trial court's decision is contrary to both the facts and the law. Initially, the trial court's reliance on the Adoption Act as a basis for discharging the dependency petition is misplaced. *See id*. at 6 n.22 (citing 23 Pa.C.S.A. §2511(b), which precludes the **termination** of parental rights solely on the basis of, *inter alia*, inadequate housing and income). However, this is not a termination case, it is a dependency proceeding. The trial court does not point to any law in the context of **dependency proceedings** where our courts have applied § 2511(b) of the Adoption Act. Moreover, the trial court does not cite to any law in the dependency context where we have imposed a requirement on a child welfare agency to prove the parent is at fault for a dangerous or unsuitable housing condition as a prerequisite to a finding of dependency.

The trial court's importation of the Adoption Act into these proceedings and its reliance on it to support a determination that it could not declare Child dependent based upon Mother's lack of suitable housing and income

_____

find no support in the record that DHS ever alleged or sought to prove aggravated circumstances.

misapplies the law and violates the mandate of the Juvenile Act. As this Court

has stated, one of the fundamental purposes of the Juvenile Act is to:

> provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter. Indeed, the relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child.

*Interest of K.C.*, 310 A.3d 296, 304 (Pa. Super. 2023) (internal quotation

marks, brackets, and citations omitted). Thus, the trial court abused its

discretion and committed an error of law in relying on the Adoption Act. *See*

*In re R.J.T.*, 9 A.3d at 1179.

The trial court also erred in excluding relevant evidence regarding

Mother's conduct while Child was in the hospital, her prior history with DHS,

her employment status, and, at the June 2024 hearing, her continuing housing

instability, evidence the court erroneously characterized as "irrelevant" and

"stale."

> Our Supreme Court has stated:
>
> Evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Pa.R.E. 401. Irrelevant evidence is inadmissible, and relevant evidence "is admissible except as otherwise provided by law." Pa.R.E. 402. The "except as otherwise provided by law" qualifier includes the principle that relevant evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

*Brady v. Urbas*, 111 A.3d 1155, 1161 (Pa. 2015). As noted above, courts in

dependency cases are required to make a "comprehensive and searching"

inquiry. *In the Interest of Black*, 417 A.2d at 1181. The approach should be a wholistic one. *See id*. at 1182. This Court has specifically noted the definition of a dependent child is "intended to be flexible and to encompass the myriad circumstances that may cause a child to be without proper parental care or control." *Interest of A.D.-G.*, 263 A.3d 21, 30 (Pa. Super. 2021). These circumstances "routinely" include "lack of appropriate housing[,]" and unemployment. *Id*.; *see also In re K.D.*, 871 A.2d 823, 831 (Pa. Super. 2005) (concluding evidence was sufficient to support *termination* of mother's parental rights and discussing evidence of mother's continuing failure to obtain employment).

Child was less than two months old at the time of the February 2024 dependency hearing. As discussed above, prognostic evidence, particularly in cases involving infants, is relevant and admissible and so powerful it can itself sustain a finding of dependency. *See In re E.B.*, 83 A.3d at 433; *Matter of DeSavage*, 360 A.2d 241-42. Here, the evidence showed Mother did not have custody of her other three children. *See* Dependency Petition, 1/30/24, at 1-2. Further, two of those children, both of whom were toddlers at that time, had been adjudicated dependent and Mother's parental rights to those children terminated because she was unable to remedy the unsuitable housing conditions, neglect, and medical neglect that led to their placement. *See id*. This evidence was relevant and admissible both as prognostic evidence and to show Mother's current housing problems were not an isolated issue but dated

back to 2016. Thus, any concern about the alleged staleness of the evidence is misplaced.

With respect to Child's hospitalization, the evidence showed Child remained hospitalized after birth largely because of issues with feeding and weight loss and, during this period, had some need of a feeding tube. ***See*** N.T., 2/26/24, at 11-15; Dependency Petition, 1/30/24, at 2 (unnumbered). The hospital's concerns that Mother (despite being unemployed) was spending little time with Child and was refusing to feed him was directly relevant to the question about whether Child would be safe with Mother and whether he was without proper parental care, control, and supervision.

Moreover, given Mother's history of physical neglect of her other children, her lack of employment was relevant to her ability to supporting herself and Child and/or obtaining suitable housing without any source of income.[10] Thus, the trial court abused its discretion and committed an error of law in excluding the above evidence.

In addition to multiple errors of law, to the extent the trial court made findings of fact, it erred. Initially, we are confused by the trial court's multiple statements in its opinion that there was no evidence as to where "the children

_____

[10] We note Mother offered no evidence at either hearing. The trial court's statement that Uncle, who was not present for either hearing, would support Mother and Child was speculative and the trial court's reliance on this statement in finding Child was not dependent was, at best, misplaced. ***See*** N.T., 6/3/24, at 18-19.

had been residing for the life of the case[,]" and the court's apparent inference that the alleged lack of such evidence meant the children[11] were safely residing with Mother. Trial Court Opinion, 8/13/23, at 6; *see also id*. at 7-8. To the contrary, the record plainly shows that, from birth in late December 2023 until January 11, 2024, Child was in the hospital. *See* N.T., 2/26/24, at 11-15; Recommendation for Shelter Care, 1/12/24, at 1-2. Following his release from the hospital, Child was immediately placed in foster care. *See* N.T., 2/26/24, at 16. The continuance orders issued by the trial court in Spring 2024, specifically state commitment of Child to DHS continued and Child resided in foster care. *See* Continuance Order, 4/8/24, at 1; Continuance Order, 4/19/24, at 1.[12]

The trial court's finding Child was not dependent because Child could stay indefinitely with Great-Grandmother, or some other relative also lacks record support. In the dependency petition, DHS noted Mother claimed she

_____

[11] As noted above, Mic.B. is not a party to the instant appeal. However, with respect to her, the record demonstrates at the time of the February 2024 dependency hearing, Mic.B. resided with Grandmother. *See* Crisis/Rapid Response Family Meeting Report Conference, 1/17/24 at 1 (unnumbered); N.T., 2/26/24, at 9. At some point between February 2024 and June 2024, DHS took custody of Mic.B. and she was residing in the same foster home as Child. *See* N.T., 6/3/24, at 8.

[12] The court's interruption of Mr. Addison's testimony at the June 2024 hearing impaired DHS's ability to show where Child was then living. During what testimony the court permitted, Mr. Addison stated he made Mother aware she would not be able to "have her kids back" until her housing situation stabilized, N.T., 6/3/24, at 16, which clearly showed Child had remained in care.

and Child could stay with either Grandmother or Father, but an investigation proved this statement was untrue. *See* Dependency Petition, 1/30/24, at 2-3. With respect to Great-Grandmother, the evidence at the February 2024 dependency hearing demonstrated Great-Grandmother lived in a senior facility, the management was permitting ***Mother*** to stay there ***temporarily*** but she could be evicted at any time. *See* N.T., 2/26/24, at 8-9. However, Ms. Williams, the DHS investigator, testified it was not even clear if ***Mother*** was residing at the senior facility in February 2024, ***see id***., and by the time of the June 2024 hearing, Mother resided not with Great-Grandmother, but Uncle. *See* N.T., 6/3/24, at 13-14. Moreover, Great-Grandmother was not present at either hearing and there is nothing of record to support a claim she was willing to house both Mother and Child and/or that the management would permit an infant to reside in a senior living facility. Additionally, DHS had never inspected the residence for suitability and safety. Finally, as the trial court conceded, this Court has found casual housing arrangements where the parent does not have a lease to be unsuitable. *See* Trial Court Opinion, 8/13/24, at 5; ***Interest of A.J.F.***, 318 A.3d 1288 (Pa. Super., filed April 29, 2024), at *4.[13]

The only other possible relative placement Mother offered was with Uncle. However, the testimony at the February 2024 dependency hearing

---

[13] *See* Pa.R.A.P. 126(b) (unpublished non-precedential memoranda decision of Superior Court filed after May 1, 2019, may be cited for persuasive value).

established Uncle failed the mandatory clearances. *See* N.T., 2/26/24, at 13. Thus, Mother and Child could not reside with Uncle, even without regard to the facts Mother refused to supply either DHS or CUA with Uncle's address or contact information, Uncle had not reached out to contact the CUA or DHS to have his home assessed, and Mr. Addison had previously warned Mother her failure to cooperate and obtain suitable housing would result in Child's remaining in care. *See* N.T., 6/3/24, at 16.

The record is also devoid of support for the trial court's *sua sponte* decision to defer adjudication in this matter. Even with the diminished record that resulted from the trial court's erroneous evidentiary rulings, the record demonstrated, at the time of the first hearing Child was less than two months old, had recently been released from intensive care, and had not resided with Mother. *See* Dependency Petition, 1/30/24, at 1-3 (unnumbered); N.T., 2/26/24, at 16. The record also reflected Mother was homeless, drifted between Great-Grandmother's residence and Uncle's, both residences were unsuitable for Child, and neither of the other relatives offered by Mother as kinship resources were willing to allow Mother and Child to live with them. *See* Dependency Petition, 1/30/24, at 1-3 (unnumbered); N.T., 2/26/24, at 8-19. The record also demonstrates Mother was evasive, untruthful, and uncooperative. *See id*. This evidence was wholly sufficient to demonstrate Child was without proper parental care and no such care was immediately

available. *See In re A.B.*, 63 A.3d at 349; *In re M.W.*, 942 A.2d at 428; *see also Interest of A.D.-G.*, 263 A.3d at 30.

Further, when the evidence at the first hearing is supplemented by the diminished testimony the trial court allowed at the June 2024 dependency hearing, the court's dependency ruling is further shown to be unsustainable. Despite the court's *sua sponte* grant of a four-month grace period, Mother had not found housing, was still living with Uncle, and was refusing to cooperate with DHS and CUA. *See* N.T., 6/3/24, at 12-17. Moreover, Mother was not visiting regularly with Child. *See id*. at 9. For this additional reason, the trial court erred and abused its discretion in not adjudicating Child dependent. The trial court's legally and factually erroneous ruling denying dependency cannot stand.

In its second issue, as an alternative basis for relief, DHS contends the trial court violated its right to due process of law by prejudging the case before hearing the evidence. *See* DHS's Brief at 24-26. The trial court disagrees, claiming that both the admissibility of evidence and the weight to be afforded such evidence was within its purview and it did not violate DHS's right to due process of law. *See* Trial Court Opinion, 8/13/24, at 8.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and *in a meaningful manner*." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (citations omitted, emphasis added). In dependency cases, this Court has held due process is satisfied where the party

is afforded sufficient notice, the opportunity to be heard, and the chance to defend oneself in an impartial tribunal. *See generally, In re Adoption of J.N.F.*. 887 A.2d 775 (Pa. Super. 2005); *In the Interest of A.P.*, 692 A.2d 240 (Pa. Super. 2007); *see also Donna H.*, 602 A.2d at 1385 (noting the failure of the trial court to allow the agency to make a full and complete record denied both the trial court and the appellate court the opportunity to properly evaluate the case).

Here the record of the case, as discussed in detail above, demonstrates the trial court denied DHS a full and fair opportunity to be heard as due process requires. The trial court, often acting *sua sponte* and without any basis in law, arbitrarily and capriciously excluded relevant evidence, interrupted DHS's witnesses' testimony, unnecessarily continued the proceedings, then refused to listen to further testimony at the continued proceedings, and informed counsel for the child and parents that cross-examination was unnecessary. A review of the notes of testimony shows the trial court appeared to have pre-judged the matter, and, for reasons not apparent from the record, there is an inference the court blamed DHS for Mother's failure to find suitable housing while ignoring the evidence of Mother's dishonesty and failure to cooperate with DHS. *See* N.T., 2/26/24, at 7, 15, 17-18, 20; N.T., 6/3/24, at 16-21.

The court analyzed the case under a framework inappropriately imported from the Adoption Act and then faulted DHS for not meeting the

higher termination standard and imposed a requirement not supported by dependency law to show Mother was at fault for her lack of suitable housing, while simultaneously failing to cite to any pertinent law justifying its exclusion of relevant evidence. *See id*. at 6-10. Accordingly, we are constrained to find on this record, the trial court violated DHS's right to due process of law.

In closing, we express our profound dissatisfaction with the trial court's actions in this case. We are appalled by the trial court's willingness to give full physical and legal custody of a less than six month-old infant to a Mother who had never cared for Child, had not visited the Child regularly, had no known address or means of support, and who refused to cooperate with DHS or CUA, based upon the court's factually-unsupported speculation that relatives, who had already either been deemed unsuitable and/or had expressly disclaimed any interest in caring for Child, would permit Mother and Child to reside with them. As we discussed in *Matter of DeSavage*, extreme care must be taken in cases concerning infants lest the court's "experiment proves unsuccessful, [and] the consequences to the child could be seriously detrimental or even fatal." *DeSavage*, 360 A.2d at 242. The trial court failed in every possible way to take such care in this matter.

Therefore, for all the foregoing reasons, we reverse the trial court's order discharging the dependency petition, remand for an adjudication of dependency, and for a dispositional hearing consistent with this opinion. In

so doing, we wish to make it abundantly clear that we expect the trial court to scrupulously comply with the dictates of the law as cited above.

Order reversed.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/27/2025